NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-1831
_____

CHARLES D. WELKER, JR.,
Appellant

v.

COMMISSIONER OF SOCIAL SECURITY
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3-19-cv-01919)
Magistrate Judge: Honorable Karoline Mehalchick
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
December 9, 2021

Before: SHWARTZ, PORTER and FISHER, *Circuit Judges*.

(Filed: January 11, 2022)
_____

OPINION[*]
_____

FISHER, *Circuit Judge*.

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Plaintiff Charles Welker, Jr., appeals the denial of his application for disability insurance benefits. Following a hearing, an Administrative Law Judge denied Welker's application, and, after Welker exhausted administrative remedies, the District Court upheld the ALJ's decision.[1] Welker first argues the ALJ failed to resolve conflicting evidence from his physicians and witnesses and, second, that the ALJ's conclusion regarding his residual functional capacity is not supported by substantial evidence.[2] Finding no error, we will affirm.[3]

Before going further, we underscore the narrowness of Welker's disagreement with the ALJ's decision. The ALJ found that Welker had several severe impairments,

---

[1] The District Court had jurisdiction pursuant to 42 U.S.C. § 405(g), and we have jurisdiction under 28 U.S.C. § 1291 and 42 U.S.C. § 405(g). The case was heard by the Chief Magistrate Judge for the Middle District of Pennsylvania, exercising the authority of the District Court, by consent of the parties. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

[2] Residual functional capacity is the "most [applicants] can still do despite [their] limitations." 20 C.F.R. § 404.1545(a)(1). If jobs that an applicant can still perform exist in the national economy in significant numbers, then that applicant is not considered "disabled" for the purpose of disability insurance benefits. *See id.* §§ 404.1520(a)(4)(v), 404.1560(c)(1).

[3] We review an ALJ's decision for substantial evidence, meaning we accept as conclusive findings of fact supported by such evidence. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019); *Thomas v. Comm'r of Soc. Sec. Admin.*, 625 F.3d 798, 800 (3d Cir. 2010); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 118 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999)).

including schizophrenia and bipolar disorder.[4] The ALJ also agreed these impairments could reasonably cause Welker's symptoms. Chief among these were anxiety and paranoia, especially when in public; difficulty completing tasks and following instructions; and trouble managing himself and engaging in social interactions. However, the ALJ disagreed with Welker over the intensity, persistence, and limiting effects of these symptoms on his ability to function. As a result, the ALJ concluded that Welker could, with some limitations, still perform jobs that exist in significant numbers in the national economy.[5] The ALJ reached this conclusion largely by relying on the notes of Welker's treating physicians, including his treating psychiatrist, Dr. Muhammad Qamar, who observed Welker showing a stable demeanor and responding well to medication on multiple occasions.

Turning to Welker's first argument, an ALJ must acknowledge conflicting evidence and explain the rejection of pertinent evidence.[6] This is precisely what the ALJ

---

[4] Specifically, "schizophrenia, paranoid type, a bipolar disorder, depressed, severe with psychotic features, a substance-induced psychotic disorder with delusions, a brief psychotic disorder, an attention deficit hyperactivity disorder, combined type, a panic disorder without agoraphobia, a generalized anxiety disorder, a posttraumatic stress disorder, a cannabis use disorder and an alcohol use disorder." Appx. 30.

[5] The ALJ limited Welker to jobs involving "simple, routine tasks, not performed in a fast-paced production environment, involving only simple work-related decisions, and in general, relatively few work place changes . . . ." Appx. 33. The ALJ also limited Welker to working "primarily with objects rather than people with no jobs requiring teamwork or interaction with the public" and no jobs involving alcohol, marijuana, narcotic drugs, or in the medical field. *Id.*

[6] *Burnett*, 220 F.3d at 121–22; *Cotter*, 642 F.2d at 706–07.

did here. Contrary to Welker's contention, the ALJ reviewed the evidence and noted discrepancies among testimony and physicians' notes. The ALJ explained why he found the notes and records of some treating physicians—including those of Dr. Qamar—more persuasive than other evidence in the record. Dr. Qamar's notes predominantly show instances of Welker displaying no or minimal psychiatric symptoms and demonstrating stable behavior; they also suggest medication may effectively control Welker's conditions. To support his reliance on Dr. Qamar, the ALJ drew attention to Dr. Qamar's longtime treatment relationship with Welker, noted that Dr. Qamar's substantive observations aligned with those of other doctors, and offered a reasonable basis to discount countervailing evidence.[7]

Welker asserts the ALJ failed to account for errors in Dr. Qamar's treatment notes or to resolve discrepancies between the notes and other portions of the record.[8] Alleged

---

[7] Particularly, the ALJ indicated that the most debilitating effects of Welker's symptoms could be controlled by medication. To be clear, an impairment being controllable by medication does not compel the conclusion that an applicant is not disabled. *See Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 356 (3d Cir. 2008). But here, it shows why observations of more severe symptoms are not necessarily inconsistent with medical findings that tend to show an ability to work.

[8] When setting aside evidence, we require an ALJ to give only "some indication of the evidence which he rejects," and of the "reason(s) for discounting such evidence." *Burnett*, 220 F.3d at 121. This allows a reviewing court to better determine if "significant probative evidence" was not credited or simply ignored. *Id.* (quoting *Cotter*, 642 F.2d at 705). At the same time, "we do not expect the ALJ to make reference to every relevant treatment note in a case where the claimant . . . has voluminous medical records." *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001). And an ALJ is not required to "cite all evidence a claimant presents, including evidence that is irrelevant to her case." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008).

4

errors include, for instance, misstatements of Welker's age and mischaracterizations of his medical history. However, these discrepancies are generally minor and of the sort to routinely appear in medical notes. Additionally, Welker primarily raises these discrepancies to call into question an observing doctor's credibility, not as directly probative evidence showing the intensity, persistence, and limiting effects of his symptoms. Therefore, these errors do not rise to the level of pertinent evidence requiring an explanation by the ALJ before being set aside.[9]

The same is true for certain discrepancies in treatment dates. Welker points to treatment notes by Dr. Qamar that, according to him, describe visits in 2012 and 2018 that could not have occurred based on Welker's inpatient hospitalization at the same time. These discrepancies do not seriously undermine Dr. Qamar's credibility because they are just as likely clerical mistakes as reckless or deliberate falsification.[10] Like the other errors in the notes, these discrepancies are not pertinent evidence.

Further, Welker claims the ALJ's failure to acknowledge his criminal history, showing he made obscene gestures and yelled obscenities at passersby, means the ALJ

---

[9] Although a decision should be thorough, we have held that an ALJ may permissibly "overlook" evidence that is "neither pertinent, relevant[,] nor probative." *Johnson*, 529 F.3d at 204.

[10] The ALJ did not explicitly discuss these discrepancies, but he weighed the relative credibility of the records giving rise to the 2018 discrepancy—the notes of Dr. Adam Bloom against those of Dr. Qamar—and determined Dr. Bloom's notes to be less credible. The ALJ appears not to have relied on Dr. Qamar's notes from the 2012 visit.

did not consider all pertinent evidence.[11] However, the ALJ credited Welker's testimony and medical notes regarding the same symptoms exhibited by these incidents, and this evidence is consistent with the ALJ limiting Welker's ability to work to jobs without significant interpersonal interaction.[12] Therefore, despite the omission, the record here is sufficiently developed for us to uphold the ALJ's decision.[13]

Welker's second main argument is that the ALJ's residual functional capacity determination is not supported by substantial evidence. He claims particularly that it was error for the ALJ to rely so heavily on Dr. Qamar's treatment notes.[14] Dr. Qamar's notes, which generally show Welker experiencing minimal psychiatric symptoms, are entitled to substantial weight given his status as Welker's treating psychiatrist.[15] And, as the District Court accurately observed, Dr. Qamar's findings align with those of other physicians,

---

[11] *See Burnett*, 220 F.3d at 121–23.

[12] *See Johnson*, 529 F.3d at 201–02 (holding ALJ's failure to expressly reference or quote from passages of doctor's report not reversible error where the ALJ's conclusions suggested reliance on underlying report).

[13] *See Jones v. Barnhart*, 364 F.3d 501, 504–05 (3d Cir. 2004) (holding that ALJ must analyze all evidence in the record to ensure that "there is sufficient development of the record and explanation of findings to permit meaningful review").

[14] In making this argument, Welker relies in part on the alleged inconsistencies between the substantive conclusions in Dr. Qamar's notes and other portions of the record, which he claims the ALJ failed to resolve. However, as explained above, the ALJ permissibly resolved these discrepancies in favor of Dr. Qamar's observations.

[15] *See Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000); *Cotter*, 642 F.2d at 704; *see also* 20 C.F.R. § 404.1527(a)(2) (defining treating source).

suggesting his substantive medical conclusions are accurate.[16] So we cannot hold that the ALJ's reliance on the evidence generated by Dr. Qamar was misplaced.

Welker argues the ALJ erred by listing daily activities he could perform and omitting those he could not. However, the ALJ properly acknowledged limitations on Welker's daily life.[17] The ALJ's reference to Jennifer Lowman being a lay witness, despite her medical training and qualifications, was also not error given the nature of her relationship to Welker: that of a partner, not of a treating medical professional.[18] The ALJ gave much of Lowman's testimony some weight, but found specific points were not credible, a determination to which we generally defer.[19] The ALJ discounted Lowman's testimony, not because she lacked medical credentials, but because of the ALJ's assessment of inconsistencies between her testimony and the rest of the record.

Admittedly, the ALJ did not describe some of Welker's symptoms with the level of specificity that may be most helpful to a reviewing court. For instance, discussion of

---

[16] For instance, notes from a 2014 observation by Dr. Nitin V. Sheth show Welker experiencing "signs of mild to moderate depression" and "some signs of anxiety," but with "no apparent signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process" and with "[c]ognitive functioning and fund of knowledge . . . intact and age appropriate." Appx. 712.

[17] *See, e.g.*, Appx. 36 ("[C]laimant performs few household chores/activities and . . . he requires reminders to shower.").

[18] *See* 20 C.F.R. § 404.1527(f)(1) (describing rules applicable to both nonmedical sources of evidence and nontreating medical sources of evidence).

[19] *See Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003) ("We . . . ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.").

Welker's incidents of criminal history as well as deeper consideration of Welker's reported hallucinatory episodes and instances of inpatient treatment would have aided this Court's task. However, more is not required in this particular case for us to uphold the ALJ's decision on the basis of substantial evidence.[20] Whether or not this Court would have reached a contrary conclusion considering the record for the first time, substantial evidence supports the ALJ's findings; therefore, we are bound by the ALJ's determinations.

As a result, we will affirm.

---

[20] *See Jones*, 364 F.3d at 505.